PATRICK *v.* STATE.

Opinion delivered June 24, 1912.

1. HOMICIDE—INDICTMENT—SUFFICIENCY.—An indictment charging that the two defendants feloniously and with malice aforethought killed and murdered a person named by stabbing him with a knife held in in the hands of them, the said defendants, and with felonious intent to kill and murder him, is sufficient. (Page 259.)

2. APPEAL AND ERROR—REVIEW—NECESSITY OF EXCEPTIONS.—The giving or refusing of instructions in a criminal trial can not be reviewed on appeal where no exceptions were saved thereto. (Page 259.)

3. SAME—REVIEW—NECESSITY OF BILL OF EXCEPTIONS.—Alleged improper argument of the prosecuting attorney can not be reviewed on appeal where the bill of exceptions contains no statement of such argument. (Page 260.)

4. SAME—HARMLESS ERROR—INCOMPETENT EVIDENCE.—On a separate trial of a person indicted for murder jointly with another, the admission of declarations made by such codefendant, some of which were not made in defendant's presence, was not prejudicial error where the court stated on admitting them that they were not competent against defendant unless the evidence further showed defendant's connection therewith, and instructed the jury not to consider such declarations unless from the evidence they found a conspiracy between defendant and his codefendant. (Page 261.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; affirmed.

STATEMENT BY THE COURT.

Appellant, James Patrick, and his son, Hugh Jett Patrick, were jointly charged with the crime of murder for killing one Sterling Rose, by the following indictment:

"The grand jury of Scott County, in the name and by the authority of the State of Arkansas, accuse the defendants, James Patrick and H. J. Patrick, of the crime of murder in the first degree, committed as follows, towit: That the said James Patrick and H. J. Patrick, in the county and State aforesaid, on the 23d day of March, 1911, did unlawfully, wilfully, feloniously, and with malice aforethought, after deliberation and premeditation, kill and murder one Sterling Rose, by then stabbing him, the said Sterling Rose, with a certain knife, then and there had and held in the hands of them, the said James Patrick and H. J. Patrick, and with a felonious intent then and there him, the said Sterling Rose, wilfully and

maliciously to kill and murder, against the peace and dignity of the State of Arkansas."

To this indictment, a demurrer was interposed and overruled. Upon their application the venue was changed to the Fort Smith District of Sebastian County, and the appellant was separately tried at his election.

The testimony tends to show that appellant and his son, Hugh Jett Patrick, attended a dance on the night of the killing, uninvited, at the residence of Ira Brown, gotten up by the Rose boys. That one day before the dance, Hugh Jett Patrick, not in the presence of appellant, his father, asked Brown if they might have a fight at his house the night of the dance. Brown objected to this, saying that he did not want any fuss there, and was told by young Patrick that it was Hugh John Rose he wanted to have the difficulty with. The Patrick boy then asked Brown to agree to get the Rose boy out of the house for him. Brown first assented to this, saying he would try, but, after thinking a moment, told him he could not afford to do a thing like that, and left him. On the night of the killing, Hugh John Rose was playing the fiddle for the dancers. Appellant, Sterling Rose, the deceased, and others were in the adjoining room of the house near the fireplace. Hugh Jett Patrick came to the dance without his fiddle, and, being asked by Will Rutledge where it was, said, "Do you suppose I came here for a dance?" to which Rutledge replied, "I know." Witness then said: "I saw he was drinking, and knew there was hard feelings between them, and thought they might have a racket." Rutledge then went immediately to Sterling Rose, and said, "There is going to be trouble here tonight, and the old man replied: "I reckon not." About that time the fight began in the other room. Hugh Jett Pattrick come into the room when Hugh John Rose was playing the fiddle, and commenced dancing in front of him in a half circle, struck the fiddle from his hands, and began to strike him, and Rose ran into the other room, Patrick still striking him. Deceased was sitting near the fire, holding a baby, one of his grandsons, in his arms, and asked Will Rutledge to separate them, and Rutledge said, "No," that he would hold the baby and let him go.

Dempsey Rose, a justice of the peace, commanded the

peace, tried to separate the combatants, and Hugh Jett Patrick raised up and struck him a lick or two. Rutledge took the child, and old man Rose started towards them, when appellant said: "You are the man I am looking for," and clinched with him. At this time Ira Brown entered the house, and tried to separate the boys, and Hugh Jett Patrick said: "You have gone back on me," and struck at Brown. Brown knocked him down a time or two, and then got his gun, which was taken away from him. Old man Rose was heard to cry out: "He is cutting me; take him off." And some of them picked him up and started to place him on the bed, and Hugh Jett Patrick rushed over and jerked hands full of his hair and beard out, and stood over him after they had put him on the bed, and told Hugh John Rose to meet him at the trial and kiss his people good-bye before coming, that he would be in the same shape his old dad was.

Deceased was cut on the outside of the leg below the knee with a pocket knife and died within a short time thereafter. Patrick, appellant, stated at the time that he was the one that did the cutting, and was told by his son, Hugh Jett Patrick, that he had better keep his mouth shut. Hugh Jett Patrick then kissed his wife and said: "We have done what we came here to do. It was bloody, but it was sweet."

Appellant stated that he heard the racket in the other room at the dance, and young Rose came running into the room where he was, with his son fighting him, and he thought he would separate them and when he got to them he met old man Rose, the deceased, and they clinched; that he did not know who clinched first; that he took out his knife when they fell on the floor, and that they were all on top of him, and he said to himself: "I will turn some of you aloose." "I jobbed with my knife, and didn't know who I hit. I did not get out my knife until they wallowed me on the floor and bit one of my fingers nearly off. The Rose girl took hold of the knife, and I would not try to get it away for fear I would cut her. I was on my back, and I do not know how many had hold of me. My son and I had been for some furniture for him, and stopped at the dance. I had no thought of trouble. I would not have struck the one lick if I had not had to do it in self-preservation and protection. I went and surrendered the next day to the sheriff.

I was not drunk, but after the fight my son seemed pretty tight. The remark I made about my wife standing it better than I thought was on account of her heart. She is feeble. I once had some words with Mr. Rose, and told him I would see him some time, and he said, 'By shot, now is the time; come on.' I told Idus Dunn to say to the people that they could tell the truth all they pleased, but if they got to swearing lies and sent me to the penitentiary there would not be Roses enough left to bloom when I got back. I told Mr. Culver that I was going to waive this before the grand jury, and that me or Hugh would not be here when court met. I knew he had not done well in his farming, and believed he would go to his wife's people in Oklahoma, and I had thought of moving also. I was not invited to the dance that night. I don't remember of being out of the house but once after I got there. I was in the other room by the fire when the trouble began. I saw them come in, and it looked like my son had hold of Rose, and was striking him with his left hand. I did not see Rose strike at my son, but I had to attend to my own business. I think we grabbed each other. We were facing when we clinched. Mr. Rose fell on top of me, and they grabbed me and kicked me in the face and nearly bit one of my fingers off. I used my right hand in cutting. I usually carry my knife in my left pocket, but guess I slipped it in the other. I did not know who I was cutting. I did not hand up the knife as my witnesses have said. I gave the knife to the girl."

He said he had not been to a dance for years, and was ashamed to be there, as old as he was. "I am a temperance man and never drank much before;" that he had been drunk only once in twenty-five years.

One of the witnesses said that old man Patrick came towards the boys with his hand in his pocket, and was moving his hand this way (indicating). Then he took his hand out of his pocket, and held it down by his side, "but I do not know if he had his knife." That when he stepped into the room later he heard old man Rose cry to take him off, but he didn't know who was on top.

Carrie Rose testified that when the boys came into the room fighting, appellant, as her father was trying to part them, said: "You are the one I am after," and grabbed him, and that

she heard her father say: "Take him off, boys; he is cutting me!" before they struck the floor. That she took hold of appellant's hand, and tried to take the knife from him. There was other testimony that Rose, the deceased, was on top of Patrick, appellant, on the floor when they were separated.

The court instructed the jury, and no exceptions were saved to any instructions given or refused.

From the judgment assessing the punishment at five years in the penitentiary the appellant has appealed.

*The appellant, pro se.*

1. The defendant had the right to use whatever force appeared to him necessary to protect his person or life from great bodily injury, and also to protect the life of his son. 69 Ark. 648; 59 *Id.* 132; 67 *Id.* 601.

2. The State must make a *prima facie* case of conspiracy before the declarations of a conspirator are competent. 87 Ark. 34; 77 *Id.* 444.

3. The argument and remarks of the prosecuting attorney were improper and prejudicial. 74 Ark. 489; 73 *Id.* 453-458.

4. The indictment is bad under the statute.

*Hal L. Norwood,* Attorney General, and *William H. Rector,* Assistant, for appellee.

1. The indictment substantially complies with the statute. 58 Ark. 47.

2. The objectionable remarks of the counsel for the State are not incorporated in the bill of exceptions.

3. The verdict is amply sustained by the evidence, and the court properly charged the jury.

KIRBY, J., (after stating the facts). No brief was filed by counsel for appellant, and the motion for new trial assigns the following errors:

That the court erred in overruling the demurrer to the indictment, in the giving and refusing of certain instructions, in permitting improper argument by the prosecuting attorney, and in allowing the introduction of incompetent testimony.

The indictment is sufficient, and the court did not err in overruling the demurrer thereto. *Evans* v. *State,* 58 Ark. 52.

No exceptions were saved to the giving or refusing of any

instruction, neither does the bill of exceptions contain any statement of the argument of the prosecuting attorney complained of, and, such being the case, this court can not review the action and ruling of the trial court relative thereto, as has often been held.

The next contention is that the court erred in permitting the introduction of the statements made by Hugh Jett Patrick to his wife immediately after the difficulty and just before leaving the dance, notwithstanding they were made in the presence of appellant, as well as his statement and request of Brown, relative to permitting him to have a fuss at his house the night of the dance, not made in appellant's presence and also witness Rutledge's statement that Hugh Jett Patrick requested him to get either one of the Roses out of the house for him, made in appellant's absence.

The court, at the time of the objection to the introduction of the statement by the witness, Rutledge, said: "Unless defendant is connected with it, it would not be competent, but, as you have to ask the question at some point, go ahead, with the understanding that it is not competent unless they are connected together."

The defendant excepted, and the court said: "The court instructs the jury, at this time, that the declarations made by Hugh Jett Patrick in the absence of James Patrick, do not bind James Patrick, unless the evidence further connects James Patrick. They have to start their evidence at some point, and the court can not direct them at what point."

Objection to the statement of Hugh Jett Patrick to Ira Brown, asking permission to have the fight at the dance at his house in appellant's absence, being made, the court stated: "The statement in the absence of James Patrick would not be competent unless you connect him with it." Upon other objections as to the introduction of one of the statements, the court said: "The jury understand, unless they show they were connected together, it would not be binding on the defendant, James Patrick."

The court also finally instructed the jury "that, unless they found from the evidence that there was a conspiracy between the defendant and Hugh Jett Patrick to kill the deceased, Sterling Rose, or do him some great bodily injury, they should

not consider any statements made by Hugh Jett Patrick, not in the presence and hearing of the defendant."

If any of these statements made by the son of appellant in his absence were not competent, under the circumstances of this case, we are of the opinion that any prejudice that might otherwise have resulted to him on account of their introduction was removed by the court's said directions and instructions to the jury, and also that the testimony is sufficient to sustain the verdict.

Finding no prejudicial error in the record, the judgment is affirmed.